# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| GEORGE LEON, derivatively on behalf of, AMERICAN AIRLINES GROUP INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT D. ISOM, JR., DEVON E. MAY, DAVID G. SEYMOUR, GANESH JAYARAM, COLE BROWN, VASU S. RAJA, ADRIANE M. BROWN, JOHN T. CAHILL, MICHAEL J. EMBLER, MATTHEW J. HART, SUSAN D. KRONICK, MARTIN H. NESBITT, DENISE M. O'LEARY, VICENTE REYNAL, GREGORY D. SMITH, and DOUG STEENLAND, <br><br> Defendants, <br><br> and <br><br> AMERICAN AIRLINES GROUP INC., <br><br> Nominal Defendant. | Case No: 4:24-cv-00918 <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff George Leon ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant American Airlines Group Inc. ("American Airlines" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Robert D. Isom, Jr. ("Isom"), Devon E. May ("May"), David G. Seymour ("Seymour"), Ganesh Jayaram ("Jayaram"), Cole Brown ("Cole Brown"), Vasu S. Raja ("Raja"), Adriane M. Brown ("Adriane

Brown"), John T. Cahill ("Cahill"), Michael J. Embler ("Embler"), Matthew J. Hart ("Hart"), Susan D. Kronick ("Kronick"), Martin H. Nesbitt ("Nesbitt"), Denise M. O'Leary ("O'Leary"), Vicente Reynal ("Reynal"), Gregory D. Smith ("Smith"), and Doug Steenland ("Steenland") (collectively, the "Individual Defendants," and together with American Airlines, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of American Airlines, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding American Airlines, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 20, 2023 to May 28, 2024, both dates inclusive (the "Relevant Period").

2.      American Airlines is a holding company and its principal, wholly owned

subsidiaries are American Airlines, Inc. (American), Envoy Aviation Group Inc., PSA Airlines, Inc. (PSA) and Piedmont Airlines, Inc. (Piedmont). American Airlines was formed in 1982, under the name AMR Corporation (AMR), as the parent company of American, which was founded in 1934.

3. American's primary business activity, through its wholly owned regional airline subsidiaries and third-party regional carriers operating as American Eagle, operates a major network air carrier, providing scheduled air transportation for passengers and cargo through the Company's hubs in Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York, Philadelphia, Phoenix and Washington, D.C. to locations around the United States and around the globe. The Company boasts, as of December 31, 2023, 965 mainline aircraft and an additional 556 regional aircraft, which transported approximately 211 million passengers in 2023.

4. However, approximately four years earlier, as of December 31, 2019—the last year before COVID-19 enveloped the globe and ravaged air travel—American Airlines operated 942 mainline aircraft and an additional 605 regional aircraft which transported approximately 215 million passengers in 2019.

5. In October 2019, mere months before the pandemic emerged, Defendant Raja became the Company's Senior Vice President of Strategy. Through this role, Defendant Raja reshaped several facets of the Company, including moving to establish an American Airlines hub in Boston, a partnership with Alaska Airlines at the Seattle hub, an operating agreement with JetBlue for the Northeast, and introducing service from Seattle to Bangalore.

6. However, shortly thereafter, Defendant Raja's expansive plans were thrown into disarray by the COVID-19 pandemic. To maneuver American Airlines through the pandemic,

Defendant Raja initiated several unique operational strategies, one of which increased the number of flights to the Sunbelt by utilizing the Company's Charlotte and Dallas hubs at a time when other airlines were reducing service.

7.     In December 2022, Defendant Raja introduced a new sales strategy that sought to reduce internal costs so that the Company could pay down the debt it had gathered during the pandemic. The new strategy assumed that the reduction in corporate business travel after the pandemic would allow American Airlines to significantly alter its relationships with its corporate customers by abandoning discounts the Company paid to corporate travel agents. In other words, the Company moved to nudge business class customers to book their flights through American Airlines' website instead of business class customers' previous practice of booking flights through corporate travel agencies.

8.     To implement this strategy, the Company significantly cut its corporate sales division staff and chose to rely on its vast network and loyalty program to attract more direct bookings through the Company's website. This new distribution capability, or "NDC," prevented customers from using frequent flyer mileage points unless customers used the Company's website or a handful of approved travel agencies. This strategy caused American Airlines to erase forty percent of its lowest fares from many online booking platforms that were employed by travel agencies and their customers.

9.     However, unknown to the public, this new strategy received strong pushback almost immediately from travel agencies and corporate travelers—groups who were American Airlines' most lucrative customers—that triggered drops in revenue and earnings as these customers booked less with the Company. For example, in a March 2023 letter to the Consumer

- 4 -

Protection and Antitrust Divisions of the United States Department of Justice, the American Society of Travel Advisors ("ASTA") called the Company's actions a "clear abuse" of market power as American Airlines vowed to remove forty percent of its fares from operators using the widely used Global Distribution System ("GDS"): "To put this in perspective, the IATA advised that during 2022, just 10% of indirect airline sales came from NDC-based connections." That figure was up 5-6% in one year from 2021. Plainly, the Company's NDC strategy effectively blocked certain parts of the travel agent industry such as corporate travel management companies ("TMCs") from booking American Airlines' best fares, thereby making it harder for customers to access American Airlines services, and in result, causing the Company to lose customers and miss revenue projections.

10.    Nevertheless, throughout the Relevant Period, the Individual Defendants publicly maintained that there was "strong demand" for flying American Airlines and that the Company "continues to run a strong operation in an evolving environment in which we are very well positioned because of the hard work our team has done in recent years."

11.    The truth began to emerge on May 28, 2024, when the Company revealed that Defendant Raja, who was, by that time, American Airlines' Chief Commercial Officer, would leave the Company the following month. That same day, American Airlines also revealed poor financial results for the first quarter of 2024, causing the Company to cut guidance for the second quarter 2024 as well.

12.    The very next day, on May 29, 2024, the truth fully emerged when Defendant Isom admitted during a Bernstein Strategic Decisions Conference call that "***we believe [this] is in part due to the changes that we have made to our sales and distribution strategy***" including that "…***we***

- 5 -

*didn't execute well*" and that "***we've driven some customers away. We restricted some customers from actually [finding] our product***."

13.     On this news, the price per share of American Airlines' stock fell $1.82, or 13%, from a closing price of $13.44 per share on May 28, 2024, to close at a price of $11.62 per share on May 29, 2024.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers— travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the

Individual Defendants engaged in improper insider sales, netting proceeds of over $235,000.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), its EVP and Chief Operating Officer ("COO"), its EVP and Chief Digital & Information Officer, its Senior VP & Chief People Officer, and its former Senior Vice President, Chief Commercial Officer to two federal securities class action lawsuits pending in the United States District Court for the Western District of Texas (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's issuance of materially false and/or misleading statements, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Isom's, May's, Seymour's, Jayaram's, Brown's and Raja's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the

Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, the Company is headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of American Airlines. Plaintiff has continuously held American Airlines common stock since first purchasing the stock on March 9, 2021.

### Nominal Defendant American Airlines

24.     Nominal Defendant American Airlines is a Delaware corporation with its principal

- 8 -

executive offices at 1 Skyview Drive, Fort Worth, Texas 76155. American Airlines's common

stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "AAL."

**Defendant Isom**

25.     Defendant Isom has served as American Airlines' President, CEO, and as a

Company director since March 2022. According to the Schedule 14A the Company filed with the

SEC on April 25, 2024 (the "2024 Proxy Statement"), as of April 9, 2024, Defendant Isom owned

912,782 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on April 9, 2024 was $13.95, Defendant Isom owned

approximately $12.7 million worth of American Airlines common stock as of that date.

26.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant

Isom received $31,438,162 in total compensation from the Company. This included $1,300,000 in

salary, $2,750,000 in bonuses, $19,500,000 in stock awards, $7,778,160 in non-equity incentive

plan compensation, and $110,002 in all other compensation.

27.     The Company's website, as of September 25, 2024, stated the following about

Defendant Isom:

> Robert Isom is Chief Executive Officer of American Airlines Group and American
> Airlines, its principal subsidiary company. He also serves on the airline's board of
> directors. Robert assumed the role of CEO in March 2022.
>
> Robert served as President of American from 2016 to 2022. In that role he oversaw
> the airline's commercial and operations activities. Prior to that, he served as
> Executive Vice President and Chief Operating Officer of American after holding
> those same positions at US Airways.
>
> Prior to joining US Airways, Robert held senior executive finance, commercial,
> operations, strategy and international roles at GMAC, LLC, Northwest Airlines and
> America West Airlines. He started his career at The Procter & Gamble Company.

Robert is chairman of the **one**world®, vice chair of the Airlines for America Board of Directors, and a member of the International Air Transport Association Board of Governors. He is also a member of the Airlink Governor's Council.

Robert earned a Bachelor of Science in mechanical engineering and a Bachelor of Arts in English from the University of Notre Dame, as well as a Master of Business Administration from the University of Michigan.

**Defendant May**

28.     Defendant May has served as the Company's Executive Vice President and CFO since January 2023. Previously, he served as Senior Vice President of Finance and Investor Relations from February 2022 until January 2023. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant May owned 151,153 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant May owned approximately $2.1 million worth of American Airlines common stock as of that date.

29.     For the 2023 Fiscal Year, Defendant May received $7,938,302 in total compensation from the Company. This included $738,075 in salary, $2,445,527 in bonuses, $2,360,000 in stock awards, $2,340,912 in non-equity incentive plan compensation, and $53,788 in all other compensation.

30.     The 2024 Proxy Statement states the following about Defendant May:

Devon E. May is Executive Vice President and Chief Financial Officer, a position he has held since January 2023. He was most recently Senior Vice President of Finance and Investor Relations, a position he held since 2022. Mr. May has held various roles of increasing responsibility at AAG, including as Senior Vice President, Finance and American Eagle (2020 to 2022), Senior Vice President, American Eagle & Operations Planning (2019 to 2020), Senior Vice President, Network Strategy (2017 to 2019) and Senior Vice President, Finance (2016 to 2017). Mr. May joined AAG in 2013, upon its merger with US Airways, where he held a variety of positions in financial planning and analysis. Between 2002 and 2005, Mr. May held a variety of positions with America West Airlines prior to its

merger with US Airways, including as Director, Alliances and Partnerships. Prior to joining America West Airlines, Mr. May served as a Senior Analyst, International Route Planning at Continental Airlines.

**Defendant Seymour**

31.     Defendant Seymour has served as the Company's COO since 2020.

32.     The 2024 Proxy Statement states the following about Defendant Seymour:

David G. Seymour is Executive Vice President and Chief Operating Officer. He was most recently Senior Vice President, Operations, a position he held since 2019. From 2016 to 2019, he served as Senior Vice President, Integrated Operations. Previously, he served as Senior Vice President, Technical Operations from 2013 to 2016. Mr. Seymour joined AAG upon its merger with US Airways, where, from 2002 to 2013, he held a variety of positions in operations and planning, including as Senior Vice President, Operations. Between 1999 and 2002, Mr. Seymour held a variety of positions with America West Airlines prior to its merger with US Airways, including as Vice President, Operations Planning and Performance. Mr. Seymour began his career serving as an airborne infantry officer in the U.S. Army.

**Defendant Jayaram**

33.     Defendant Jayaram is American Airlines' EVP and Chief Digital & Information

Officer.

34.     The Company's website stated the following about Defendant Jayaram:

Ganesh Jayaram is Chief Digital and Information Officer at American. He is responsible for all technology efforts, including software development, infrastructure, operations and security. In this role, Ganesh provides leadership, vision and direction for American's technology organization supporting both technical and business strategic objectives. His organization provides the roadmap that defines the role technology plays in customer and team member experiences and drives the next generation of strategic initiatives, including transition to the cloud, advanced analytics, machine learning, and the advancement of DevOps tools and principles.

Prior to joining American, Ganesh was the Chief Information Officer for Deere & Company where he led the organization's information technology starting in 2016. He spent more than 15 years at Deere, holding several key leadership roles, including Vice President of Information Technology, Vice President of Sales and Marketing – Asia and sub-Saharan Africa and Vice President of Corporate Strategy

& Business Development. Prior to Deere & Company, Ganesh served as Vice President of Business Development for the Water Quality Group at Danaher Corporation. Before that, he served as Director, Corporate Development for Canon U.S.A., Inc. and spent the previous six years with the Boston Consulting Group in Chicago and India.

Ganesh earned a Bachelor of Technology from the Indian Institute of Technology (BHU), Varanasi, and a doctorate in materials science and engineering from Northwestern University.

### Defendant Cole Brown

35.     Defendant Cole Brown is American Airlines' Chief People Officer.

36.     The Company's website stated the following about Defendant Cole Brown:

Cole Brown is American's Chief People Officer. In this role, she leads all aspects of the airline's People organization, including the teams supporting Global Talent and Recruitment; Benefits; Global Compensation; People Operations; Global Learning and Development; and Diversity, Equity and Inclusion.

Cole most recently served as Vice President, Human Resources for Amazon's Devices & Services, Corporate & Business Development, and Advertising & Entertainment business segments. Prior to this role, she was Amazon's Vice President of Human Resources for North America Customer Fulfillment. In these roles, she served as each business's chief human resources officer with responsibility for all aspects of human resources, including recruiting, organizational design, training and development, diversity and inclusion, and employee relations.

Prior to Amazon, Cole served as Senior Vice President and Chief Human Resources Officer for Conifer Health Solutions. Her experience also includes serving as Senior Vice President of Human Resources for Walmart U.S. Stores Operations, the company's largest business segment. Before that, she served as Chief Diversity Officer for Walmart, Inc. Prior to joining Walmart in its Legal Department, Cole practiced as an attorney specializing in employment law and administrative regulations with Bashen Consulting, Wickliff & Hall, P.C. and Doerner, Saunders, Daniel & Anderson, L.L.P.

Cole holds both a bachelor's degree and a Juris Doctor from Southern Methodist University in Dallas.

### Defendant Raja

37.     Defendant Raja served as the Company's Senior Vice President, Chief Commercial Officer from April 2022 until May 28, 2022. Previously, he worked as Chief Revenue Officer and Senior Vice President of Network Strategy. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Raja owned 83,510 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Raja owned approximately $1.2 million worth of American Airlines common stock as of that date.

38.     For the 2023 Fiscal Year, Defendant Raja received $12,218,034 in total compensation from the Company. This included $731,250 in salary, $4,468,169 in bonuses, $4,073,000 in stock awards, $2,898,190 in non-equity incentive plan compensation, and $47,425 in all other compensation.

39.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Raja made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| November 20, 2023 | 5,298 | $12.23 | $64,794 |
| November 21, 2023 | 5,121 | $12.29 | $62,937 |
| December 14, 2023 | 7,545 | $14.30 | $107,893 |

Thus, in total, before the fraud was exposed, he sold 17,964 shares of Company stock on inside information, for which he received approximately $235,624 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

40.     The 2024 Proxy Statement stated the following about Defendant Raja:

Vasu S. Raja is Executive Vice President and Chief Commercial Officer. He was

most recently Chief Revenue Officer, a position he held since 2020. Mr. Raja has held various roles of increasing responsibility at AAG, including Senior Vice President, Strategy (2019 to 2020), Vice President, Planning (2016 to 2019) and Vice President, Pricing and Yield Management (2015 to 2016). Mr. Raja joined AAG's predecessor airline in 2004 as an Analyst, Sales Planning and Analysis. Mr. Raja began his career with Teach for America in 1999 and taught for three years in Baltimore City Public Schools.

**Defendant Adriane Brown**

41.     Defendant Adriane Brown has served as a Company director since February 2011. She also serves as Chair of the Safety Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Adriane Brown owned 28,411 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Adriane Brown owned approximately $396,333 worth of American Airlines common stock as of that date.

42.     For the 2023 Fiscal Year, Defendant Adriane Brown received $301,184 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $150,000 in stock awards, and $11,184 in all other compensation.

43.     The 2024 Proxy Statement stated the following about Defendant Adriane Brown:

Select Business Experience:

•   Managing Partner of Flying Fish Partners, a technology-based venture capital firm (2018-Present)

•   President and Chief Operating Officer of Intellectual Ventures Management, LLC, a private equity firm (2010-2017)

•   Various roles, including President and Chief Executive Officer of Honeywell Transportation Systems, at Honeywell International Inc., a manufacturing company (1999-2010)

•   Various roles, most recently Vice President and General Manager of Environmental Products, at Corning Incorporated, a materials manufacturing

company (1980-1999)

Current Public Company Directorships:

- KKR & Co. Inc., a global investment company (2021-Present)

- Axon Enterprise, Inc., a law-enforcement technology company (2020-Present)

- eBay Inc., an e-commerce marketplace company (2017-Present)

Past Public Company Directorships:

- Allergan plc (2017-2020)

- Raytheon Company (2018-2020)

- Harman International (2013-2017)

Other Leadership Experience and Service:

Member of the board of directors of the International Women's Forum; former member of the board of directors of the Washington Research Foundation/WRF Capital.

Key Experience/Director Qualifications:

Financial expertise, risk management experience, extensive experience as a senior operating executive for segments of large global public companies, including industrial and manufacturing companies, investment experience in technologies and service as a public company director.

**Defendant Cahill**

44.     Defendant Cahill has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Finance Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Cahill owned 186,818 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Cahill owned approximately $2.6 million worth of American Airlines common stock as of that date.

45.    For the 2023 Fiscal Year, Defendant Cahill received $322,458 in total compensation from the Company. This included $139,890 in fees earned or paid in cash, $150,000 in stock awards, and $32,568 in all other compensation.

46.    The 2024 Proxy Statement stated the following about Defendant Cahill:

Select Business Experience:

• Vice Chairman of The Kraft Heinz Company ("Kraft Heinz"), a food and beverage company (2015-Present)

• Chairman and Chief Executive Officer of Kraft Foods Group, Inc. ("Kraft Foods Group"), until its merger with H.J. Heinz Company (2014-2015)

• Non-Executive Chairman of Kraft Foods Group (March 2014-December 2014)

• Executive Chairman of Kraft Foods Group (2012-2014)

• Executive Chairman, North American Grocery of Kraft Foods, Inc., the former parent of Kraft Foods Group (January 2012-December 2012)

Current Public Company Directorships:

• Kraft Heinz, a food and beverage company (2015-Present)

• Colgate-Palmolive Company, a consumer products company (2005-Present)

Past Public Company Directorships:

• Kraft Foods Group (2012-2015)

• Legg Mason, Inc. (2009-2014)

• The Pepsi Bottling Group, Inc. (1999-2007)

• Frontier Holdings, Inc. (1984-1985)

Other Leadership Experience and Service:

Former Industrial Partner at Ripplewood Holdings LLC; spent nine years with The Pepsi Bottling Group, Inc., culminating in the position of Chairman and

Chief Executive Officer; and worked at PepsiCo, Inc. for nine years in a variety of leadership positions.

Key Experience/Director Qualifications:

Leadership and operations experience in executive leadership roles at global public companies, as well as airline experience, investment, accounting and financial expertise, experience in consumer products industries and public company board and corporate governance experience.

### **Defendant Embler**

47.     Defendant Embler has served as a Company director since 2013. He also serves as a member of the Safety Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Embler owned 69,818 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Embler owned approximately $973,961 worth of American Airlines common stock as of that date.

48.     For the 2023 Fiscal Year, Defendant Embler received $316,482 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $150,000 in stock awards, and $26,482 in all other compensation.

49.     The 2024 Proxy Statement stated the following about Defendant Embler:

Select Business Experience:

•   Chief Investment Officer of Franklin Mutual Advisers, LLC ("Franklin Mutual Advisers"), an asset management company (2005-2009)

•   Head of Franklin Mutual Advisers' Distressed Investment Group (2001-2005)

Current Public Company Directorships:

•   NMI Holdings, Inc., a mortgage insurance provider (2012-Present)

•   Ventas, Inc., a healthcare REIT (2022- Present)

Past Public Company Directorships:

- Taubman Centers, Inc., a shopping mall REIT (2018-2020)

- CIT Group Inc. (2009-2016)

- Dynegy Inc. (2011-2012)

- AboveNet Inc. (2003-2012)

- Kindred Healthcare Inc. (2001-2008)

Other Leadership Experience and Service:

Worked at Nomura Holding America Inc. for almost a decade in positions of increasing responsibility culminating in the position of Managing Director; former member of the board of trustees of The Mohonk Preserve; and holds certificates in Cyber Risk Oversight (National Association of Corporate Directors) and Environmental Conservation and Sustainability (Earth Institute Center for Environmental Sustainability).

Key Experience/Director Qualifications:

Experience in finance, asset management and restructurings, capital markets and capital management, experience as a senior executive, perspective as an institutional investor, success as an investor and service as a director of global public and private companies.

**Defendant Hart**

50.     Defendant Hart has served as a Company director since 2013. He also serves as the Chair of the Audit Committee and as a member of the Safety Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Hart owned 76,424 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Hart owned approximately $1.1 million worth of American Airlines common stock as of that date.

51.     For the 2023 Fiscal Year, Defendant Hart received $320,680 in total compensation

from the Company. This included $147,500 in fees earned or paid in cash, $150,000 in stock

awards, and $23,180 in all other compensation.

52. The 2024 Proxy Statement stated the following about Defendant Hart:

Select Business Experience:

• President and Chief Operating Officer of Hilton Hotels Corporation ("Hilton"), a hotel developer and operator, until its acquisition by a private equity firm (2004-2007)

• Executive Vice President and Chief Financial Officer of Hilton (1996-2004)

Current Public Company Directorships:

• AMH (formerly American Homes 4 Rent), a REIT (2012-Present)

• Air Lease Corporation, an aircraft leasing company (2010-Present)

Past Public Company Directorships:

• B. Riley Financial, Inc. (2009-2015)

• US Airways Group, Inc. (2006-2013)

• Kilroy Realty Corporation (1997-2008)

• America West Holdings Corporation (2004-2005)

Other Leadership Experience and Service:

Former Senior Vice President and Treasurer of The Walt Disney Company; former Executive Vice President and Chief Financial Officer of Host Marriott Corp.; member of the Advisory Board of INTELITY, Inc.; and member of the board of directors of Heal the Bay and Conrad N. Hilton Foundation.
Key Experience/Director Qualifications:

Financial expertise, risk management experience, extensive experience as a senior operating and finance executive for large global public companies, including companies in the consumer travel industry, investment and mergers and acquisitions experience, service as a public company director and airline experience.

**Defendant Kronick**

53.     Defendant Kronick has served as a Company director since November 2015. She also serves as a member of the Safety Committee and as a member of the Corporate Governance and Public Responsibility ("CGPR") Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Kronick owned 52,583 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Kronick owned approximately $733,533 worth of American Airlines common stock as of that date.

54.     For the 2023 Fiscal Year, Defendant Kronick received $310,414 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $150,000 in stock awards, and $20,414 in all other compensation.

55.     The 2024 Proxy Statement stated the following about Defendant Kronick:

Select Business Experience:

•   Operating Partner at Marvin Traub Associates, a New York based retail consulting firm (2012-2022)

•   Vice Chairman of Macy's, Inc. ("Macy's"), owner of Macy's and Bloomingdales retail department stores (2003-2010)

•   Group President, Regional Department Stores of Macy's (2001-2003)

•   Chairman and Chief Executive Officer of Burdines/Macy's Florida (1997-2001)

Current Public Company Directorships:

•   Hyatt Hotels Corporation, a hospitality company (2009-Present)

Past Public Company Directorships:

•   The Pepsi Bottling Group, Inc. (1999-2010)

Other Leadership Experience and Service:

Member of the board of directors of the John S. and James L. Knight Foundation and the Miami City Ballet.

Key Experience/Director Qualifications:

Financial, marketing and operational expertise, as well as experience serving as a global public company director and building industry leading brands as a result of the various executive management positions held with Macy's.

**Defendant Nesbitt**

56.     Defendant Nesbitt has served as a Company director since November 2015. He also serves as a member of the Audit Committee and Chair of the CGPR Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Nesbitt owned 52,583 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Nesbitt owned approximately $733,533 worth of American Airlines common stock as of that date.

57.     For the 2023 Fiscal Year, Defendant Nesbitt received $336,592 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $150,000 in stock awards, and $46,592 in all other compensation.

58.     The 2024 Proxy Statement stated the following about Defendant Nesbitt:

Select Business Experience:

•   Co-Chief Executive Officer of The Vistria Group, LLC, a private-equity investment firm (2013-Present)

•   President and Chief Executive Officer of PRG Parking Management (PRG), an owner and operator of off-airport parking facilities (1996-2012)

Current Public Company Directorships:

• Chewy, Inc., an online retailer for pet needs (2020-Present)

• Center Point Energy, Inc., a public utility company (2018-Present)

Past Public Company Directorships:

• Jones Lang LaSalle Incorporated, a public commercial real estate company (2011-2021)

• Pebblebrook Hotel Trust (2009-2010)

• Norfolk Southern Corporation (2013-2018)

Other Leadership Experience and Service:

Former member of the board of directors of PRG; former officer of the Pritzker Realty Group, L.P.; former Vice President and Investment Manager at LaSalle Partners, one of the predecessor corporations of Jones Lang LaSalle Incorporated; Trustee of Chicago's Museum of Contemporary Art; and Chairman of the Barack Obama Foundation.

Key Experience/Director Qualifications:

Executive leadership, operational, financial and investment experience, as well as global public company board experience.

**Defendant O'Leary**

59.     Defendant O'Leary has served as a Company director since 2013. She also serves as a member of the Finance Committee and Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant O'Leary owned 127,872 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant O'Leary owned approximately $1.8 million worth of American Airlines common stock as of that date.

60.     For the 2023 Fiscal Year, Defendant O'Leary received $313,350 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $150,000

in stock awards, and $13,350 in all other compensation.

61.    The 2024 Proxy Statement stated the following about Defendant O'Leary:

Select Business Experience:

• Private venture capital investor (1997-Present)

• Partner (1987-1996) and associate (1983-1987) at Menlo Ventures, a venture capital firm

Current Public Company Directorships:

• Medtronic plc, a medical technology company (2000-Present)

Past Public Company Directorships:

• Calpine Corporation (2009-2018)

• US Airways Group, Inc. (2005-2013)

• Chiron Corporation (2002-2006)

• America West Holdings Corporation (1998-2005
Other Leadership Experience and Service:

Chair Emerita of the board of trustees of the University of Denver; member of the Board of Regents of the Smithsonian Institution; and former member of the boards of directors of the following private entities: International Environmental Standards, Galvanize, Inc., the Bonfils-Stanton Foundation, Lucile Packard Children's Hospital, Stanford Hospital & Clinics, Smithsonian National Board, the Denver Foundation, the Corporation for Supportive Housing, Connect for Health Colorado and the University of Colorado Hospital Authority.

Key Experience/Director Qualifications:

Executive leadership experience in the investment industry, financial expertise, experience in the oversight of risk management, human resources expertise, extensive service as a global public company director, success as an investor and airline industry expertise.

**Defendant Reynal**

- 23 -

62.     Defendant Reynal has served as a Company director since September 2022. He also serves as a member of the CGRP Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Reynal owned 19,008 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Reynal owned approximately $265,162 worth of American Airlines common stock as of that date.

63.     For the 2023 Fiscal Year, Defendant Reynal received $296,652 in total compensation from the Company. This included $115,000 in fees earned or paid in cash, $150,000 in stock awards, and $31,652 in all other compensation.

64.     The 2024 Proxy Statement stated the following about Defendant Reynal:

Select Business Experience:

•   Chairman of the board of directors of Ingersoll Rand Inc. ("Ingersoll") (2021-Present)

•   Chief Executive Officer and President of Ingersoll (2020-Present)

•   Chief Executive Officer and President of Gardner Denver Inc. ("Gardner Denver") (2017-2020)

•   President, Chief Executive Officer—Industrials Segment of Gardner Denver (2015-2016)

•   Various roles, including Group President at Danaher Corporation, a design and manufacturing company (2004-2015)

•   Vice President Global Operations and Supply Chain at Thermo Fisher Scientific Inc., a scientific instrumentation company (2002-2004)

•   Business Unit Manager, Aerospace Aftermarket at Honeywell Transportation Systems, a manufacturing company (1998-2002)

Current Public Company Directorships:

- Ingersoll Rand Inc., an industrial manufacturing company (2020-Present)

Past Public Company Directorships:

- Gardner Denver Inc. (2017-2020)

Other Leadership Experience and Service:

Member of the board of directors of Ownership Works.

Key Experience/Director Qualifications:

Executive leadership experience in the industrial, energy and medical industries, extensive strategic, operational and general management experience, as well as experience serving as a public company director.

**Defendant Smith**

65.    Defendant Smith has served as a Company director since January 2022. He also has served as the Company's Independent Chairman since April 30, 2023. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Smith owned 37,094 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Smith owned approximately $517,461 worth of American Airlines common stock as of that date.

66.    For the 2023 Fiscal Year, Defendant Smith received $506,698 in total compensation from the Company. This included $109,890 in fees earned or paid in cash, $350,000 in stock awards, and $46,808 in all other compensation.

67.    The 2024 Proxy Statement stated the following about Defendant Smith:

Select Business Experience:

- Chief Financial Officer and Executive Vice President of Enterprise Operations of The Boeing Company ("Boeing") (2020-2021; 2012-2021); Interim Chief Executive Officer of Boeing (2019-2020); Vice President of Finance and Corporate Controller of Boeing (2010-2012); and Vice President of Financial Planning and

Analysis of Boeing (2008-2010)

• Vice President of Investor Relations of Raytheon Company (2004-2008)

Current Public Company Directorships:

• Intel Corporation, a technology company (2017-Present)

Other Leadership Experience and Service:

Member of the boards of directors of the Lurie Children's Hospital Foundation, Northwestern Memorial Healthcare and Sierra Nevada Space.

Key Experience/Director Qualifications:

Financial expertise and extensive experience as a senior executive for a large global public company, risk management experience, extensive industry experience as executive officer of airplane manufacturer, extensive experience as a global business leader, with experience in regulatory affairs, as well as experience serving as a public company director.

**Defendant Steenland**

68.    Defendant Steenland has served as a Company director since October 2020. He also serves as Chair of the Finance Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 9, 2024, Defendant Steenland owned 29,736 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 9, 2024 was $13.95, Defendant Steenland owned approximately $414,817 worth of American Airlines common stock as of that date.

69.    For the 2023 Fiscal Year, Defendant Steenland received $307,630 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $150,000 in stock awards, and $17,630 in all other compensation.

70.    The 2024 Proxy Statement stated the following about Defendant Steenland:

Select Business Experience:

- Senior Advisor to The Blackstone Group L.P. (2009-Present)

- Chief Executive Officer of Northwest Airlines Corporation (2004-2008)

- President of Northwest Airlines Corporation (2001-2004)

- Senior Partner of law firm that is now DLA Piper LLP (1984-1991)

Current Public Company Directorships:

- Hilton Worldwide Holdings, Inc., a hotel management company (2010-Present)

Past Public Company Directorships:

- American International Group, Inc., an insurance company (2009-2023)

- London Stock Exchange Group (2021-2023)

- Performance Food Group (2012-2019)

- Travelport LLC (2012-2019)

Other Leadership Experience and Service:

Member of the board of trustees of the Brookings Institute, board of directors of the Middle East Investment Initiative and board of visitors of the Duke University Fuqua Business School; former Chairman of the Air Transport Association.

Key Experience/Director Qualifications:

Former airline president and CEO, extensive experience as a global business leader, with experience in finance, safety, restructuring and regulatory affairs, as well as experience serving as a public company director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

72.     Each director and/or officer of the Company owes to American Airlines and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

74.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at American Airlines had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock

would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

76.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to American Airlines's own Code of Ethics (the "Code of Ethics") and Standards of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal,

- 29 -

financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

78.     At all times relevant hereto, the Individual Defendants at American Airlines were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

79.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

- 30 -

80.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of American Airlines' board of directors, each of the Individual Defendants who was

a director of American Airlines was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## AMERICAN AIRLINES' CORPORATE GOVERNANCE

### *Code of Ethics*

86.     The Board of American Airlines "adopted" the Code of Ethics and each member is expected to abide by the Code of Ethics. The Code of Ethics is intended to: (1) Focus each Director on his or her duties and responsibilities to a large, publicly-held corporation; (2) Assist the Directors in the recognition and resolution of ethical issues; (3) Assist the Directors in the recognition and resolution of ethical issues; and (4) Assist the Directors in the recognition and resolution of ethical issues.

87.     The Code of Ethics states that the Board should "assist the Directors in the recognition and resolution of ethical issues" and "exhibit the highest standards of business and professional integrity."

88.     The Code of Ethics states that the Board should "comply with all laws, rules, and regulations applicable to" the Company.

89.     The Code of Ethics states that the Board "should make every reasonable effort to deal fairly with American's customers, suppliers, and team members. No Director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice."

90.     The Code of Ethics states that the Board "should communicate any suspected violations of this Code promptly to the Audit Committee Chair. Suspected violations will be investigated by the Board or its designees, and appropriate action will be taken if a violation has occurred."

### Code of Conduct

91.      The Code of Conduct's introductory letter states that "[t]he expectation of everyone who represents this airline is to act with integrity, honesty, and an absolute dedication to making responsible and ethical decisions."

92.     The Code of Conduct states the following about the Company's compliance with securities laws:

> As a public company, we are subject to various securities laws and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding our business, financial condition, and results of operations. We (1) cooperate with our Accounting department and Internal Audit, as well as our independent auditor and counsel; (2) respond to their questions promptly and with candor; and (3) provide them with complete, fair, accurate, and understandable information.

93.     Under the heading "We maintain accurate records" the Code of Conduct states the following, in relevant part:

We prepare all business records completely and honestly and record all transactions in a way that fully and fairly refects our fnancial afairs. Falsifying or concealing records or mischaracterizing payments violates our Standards and the law.

94.     Under the heading "We don't reveal or trade on inside information," the Code of

Conduct states the following:

You may not trade (or tip others to trade) securities of American or other companies based on material nonpublic—or inside— information. Material nonpublic information is any information the company has not publicly disclosed that a reasonable investor would consider important in deciding to evaluate, purchase, hold, or sell securities. Examples include financial results or forecasts, adverse changes in liquidity, major new products or services, significant capital expenditures, major contract awards or cancellations, merger or acquisition proposals, significant developments in litigation, and organizational changes, such as layoffs.

If you have material nonpublic information, you may not beat the market by trading before, simultaneously with, or shortly after the ofcial release of the information. Information should not be considered publicly disclosed until a reasonable time after it has been made public (for example, by a press release).

Insider trading is illegal and can result in disciplinary action and civil and criminal penalties.

95.     In violation of the Code of Ethics and the Code of Conduct, the Individual

Defendants conducted little, if any, oversight of the Company's engagement in the Individual

Defendants' schemes to cause the Company to issue materially false and misleading statements to

the public and to facilitate and disguise the Individual Defendants' violations of law, including

breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets,

unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics

and Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to

obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics and the

Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

### AMERICAN AIRLINES' AUDIT COMMITTEE CHARTER

96.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Committee's purpose is to act on behalf of the Board to oversee the integrity of the Company's financial statements, the independent auditor's qualifications and independence, and the performance of both the Company's internal audit function and the independent auditor. The Committee's role includes oversight of the qualitative aspects of financial reporting and disclosure to stockholders and the investment community, the Company's risk management policies that relate to the financial control environment, financial reporting and disclosure controls, and cybersecurity, and the Company's procedures for compliance with significant applicable legal, ethical and regulatory requirements. The Committee must also prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the annual proxy statement.

97.     The Audit Committee Charter, under the heading "AUTHORITY AND RESPONSIBILITY," states that:

> The Committee's key responsibilities include oversight of the independent auditor, oversight of the internal audit function, oversight of the Company's risk management policies that relate to the financial control environment, financial reporting and disclosure controls, and cybersecurity, and oversight of compliance with financial disclosure and audit requirements and related laws and regulations.

98.     Under the same heading, in the subsection titled "Oversight of Financial Reporting Compliance and Certain Risk Management Policies," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

> Annual and Interim Financial Reports – The Committee shall review and discuss with the independent auditor and management the Company's annual and interim financial reports, including (i) the independent auditor's assessment of the quality, not just acceptability, of accounting principles, (ii) the reasonableness of significant

judgments and estimates (including material changes in estimates), (iii) any audit adjustments noted or proposed by the independent auditor (whether "passed" or implemented in the financial reports), (iv) any critical audit matter ("CAM") addressed in the audit and the relevant financial statement accounts or disclosures that relate to each CAM, (v) the adequacy of the disclosures in the financial statements, (vi) the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (vii) any other matters required to be communicated to the Committee by the independent auditor under Auditing Standard 1301, as adopted by the Public Company Accounting Oversight Board. Such review and discussion shall occur prior to the filing or distribution of such reports.

Internal Controls – The Committee shall review with the independent auditor and management the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including (i) management's certification in the Company's periodic reports filed with the SEC concerning the Company's disclosure controls and procedures and any reports by management or the independent auditor of a material weakness or significant deficiency in internal control over financial reporting, (ii) the actions taken to remedy any such material weakness or significant deficiency and any changes in circumstances that have, or are reasonably likely to have, a material effect on internal control over financial reporting, (iii) management's annual assessment of the adequacy of the Company's internal control over financial reporting, (iv) the independent auditor's annual attestation report regarding the Company's internal control over financial reporting and (v) any identified act of fraud that involves management or other employees who have a significant role in the Company's internal control over financial reporting or disclosure controls and procedures.

Other Financial Disclosure – The Committee shall review and discuss earnings press releases, and shall establish procedures to review other financial information released publicly by the Company that the Committee deems appropriate for it to review.

Financial Reporting – The Committee shall review with management and the independent auditor (i) significant issues and risks that arise regarding accounting principles and financial statement presentation, including the adoption of new or material changes to existing critical accounting policies or to the application of those policies, (ii) the potential effect of alternative accounting policies available under GAAP, (iii) the potential impact of regulatory and accounting initiatives and any other significant reporting issues and judgments and (iv) any analyses prepared by management or the independent auditor with regard to the above and related auditor views.

Proxy Statement Reports – The Committee shall oversee the preparation of such

- 36 -

reports regarding matters within the scope of the Committee's role and responsibilities as may be required to be included in the Company's annual proxy statement or other public filings under applicable rules and regulations.

Standards of Business Conduct/Conflicts of Interest – The Committee shall review the Company's standards of business conduct and ethics and shall recommend any proposed changes for approval by the full Board. The Committee shall review the compliance procedures and processes in place to enforce the standards of business conduct and ethics and oversee management's monitoring of compliance with such procedures and processes. The Company's Chief Ethics and Compliance Officer shall provide periodic reports to the Committee on matters within its mandate, including potential ethics and compliance violations under investigation. The Committee shall also review and approve, on an ongoing basis, significant conflicts of interest and related party transactions in accordance with Company policies and procedures developed and approved by the Committee from time to time.

Legal Matters – The Committee shall periodically review, with the Company's counsel, any matter that could have a significant impact on the Company's financial statements.

99.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

100.    American Airlines is a holding company and its principal, wholly owned subsidiaries are American Airlines, Inc. (American), Envoy Aviation Group Inc., PSA Airlines, Inc. (PSA) and Piedmont Airlines, Inc. (Piedmont). American Airlines was formed in 1982, under the name AMR Corporation (AMR), as the parent company of American, which was founded in 1934.

101.    American's primary business activity, through its wholly owned regional airline subsidiaries and third-party regional carriers operating as American Eagle, operates a major network air carrier, providing scheduled air transportation for passengers and cargo through the Company's hubs in Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York, Philadelphia, Phoenix and Washington, D.C. to locations around the United States and around the globe. The Company boasts, as of December 31, 2023, 965 mainline aircraft and an additional 556 regional aircraft, which transported approximately 211 million passengers in 2023.

102.    However, approximately four years earlier, as of December 31, 2019—the last year before COVID-19 enveloped the globe and ravaged air travel—American Airlines operated 942 mainline aircraft and an additional 605 regional aircraft which transported approximately 215 million passengers in 2019.

103.    In October 2019, mere months before the pandemic emerged, Defendant Raja became the Company's Senior Vice President of Strategy. Through this role, Defendant Raja reshaped several facets of the Company, including moving to establish an American Airlines hub in Boston, a partnership with Alaska Airlines at the Seattle hub, an operating agreement with JetBlue for the Northeast, and introducing service from Seattle to Bangalore.

104.    However, shortly thereafter, Defendant Raja's expansive plans were thrown into

disarray by the COVID-19 pandemic. To maneuver American Airlines through the pandemic, Defendant Raja initiated several unique operational strategies, one of which increased the number of flights to the Sunbelt by utilizing the Company's Charlotte and Dallas hubs at a time when other airlines were reducing service.

105.     In December 2022, Defendant Raja introduced a new sales strategy that sought to reduce internal costs so that the Company could pay down the debt it had gathered during the pandemic. The new strategy assumed that the reduction in corporate business travel after the pandemic would allow American Airlines to significantly alter its relationships with its corporate customers by abandoning discounts the Company paid to corporate travel agents. In other words, the Company moved to nudge business class customers to book their flights through American Airlines' website instead of business class customers' previous practice of booking flights through corporate travel agencies.

106.     To implement this strategy, the Company significantly cut its corporate sales division staff and chose to rely on its vast network and loyalty program to attract more direct bookings through the Company's website. This new distribution capability, or "NDC," prevented customers from using frequent flyer mileage points unless customers used the Company's website or a handful of approved travel agencies. This strategy caused American Airlines to erase forty percent of its lowest fares from many online booking platforms that were employed by travel agencies and their customers.

107.     However, unknown to the public, this new strategy received strong pushback almost immediately from travel agencies and corporate travelers—groups who were American Airlines' most lucrative customers—that triggered drops in revenue and earnings as these

customers booked less with the Company. For example, in a March 2023 letter to the Consumer Protection and Antitrust Divisions of the United States Department of Justice, the ASTA called the Company's actions a "clear abuse" of market power as American Airlines vowed to remove forty percent of its fares from operators using the widely used GDS: "To put this in perspective, the IATA advised that during 2022, just 10% of indirect airline sales came from NDC-based connections." That figure was up 5-6% in one year from 2021. Plainly, the Company's NDC strategy effectively blocked certain parts of the travel agent industry such as corporate TMCs from booking American Airlines' best fares, thereby making it harder for customers to access American Airlines services, and in result, causing the Company to lose customers and miss revenue projections.

108.    Nevertheless, throughout the Relevant Period, the Individual Defendants publicly maintained that there was "strong demand" for flying American Airlines and that the Company "continues to run a strong operation in an evolving environment in which we are ve1y well positioned because of the hard work our team has done in recent years."

109.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers— travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was

not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

110.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales, netting proceeds of over $235,000.

### **False and Misleading Statements**

#### *July 20, 2023 Press Release*

111.    On July 20, 2023, before the market opened, American Airlines issued a press release announcing its second quarter of the 2023 Fiscal Year financial results for the quarter period ended June 30, 2023. The press release reported that American Airlines enjoyed "Record quarterly revenue of $14.1 billion, a 4.7% increase year over year," "Second-quarter net income of $1.3 billion, or $1.88 per diluted share," and "Generated operating cash flow of $1.8 billion and free cash flow of $1.2 billion in the second quarter." The press release additionally reported that American Airlines was "Raising full-year adjusted EPS2 guidance to between $3.00 and $3.75 per diluted share."

112.    The press release also contained a statement from Defendant Isom, stating, in relevant part, that "It was another fantastic quarter for American, driven by the hard work of our

team to deliver a reliable operation for our customers and the **continued strong demand for our product**." Through the press release, Defendant Isom boasted that "Our operation is performing at historically strong levels, and we have worked to refresh our fleet and build a comprehensive global network, all of which helped to produce record revenues in the second quarter," adding that "We will build on this momentum the rest of the year and continue to prioritize reliability, profitability, accountability and strengthening our balance sheet." The press release further stated the following:

> The strong revenue performance **was driven by continued broad-based demand strength** and American's completion factor performance in the quarter. **Demand was particularly strong in the month of June** driven by an increase in close-in bookings. Domestic and short-haul international revenue continue to perform well, and the airline has seen noticeable strength in long-haul international demand and yield performance.

> **July 20, 2023 Earnings Conference Call**

113.    That same day, on July 20, 2023, American Airlines held an earnings conference call with investors and analysts to discuss the Company's second quarter of the 2023 Fiscal Year financial performance. During the call, Defendant Isom began by stating as follows, in relevant part:

> The summer is well underway, and the American Airlines team is **firing on all cylinders. We continue to build on the strong foundation we have laid over the past year** and remain focused on reliability, profitability, accountability and strengthening our balance sheet.

> That focus is showing up in our results. **Everything we have said we would do at the start of the year, we have done**. Our operation is performing at historically strong levels. And this morning, we reported adjusted pretax earnings of approximately $1.8 billion for the second quarter. These earnings were well above the high end of our latest EPS guidance range, marking our fifth consecutive quarterly profit. At the start of the recovery, we told you that returning to profitability hinged on running a reliable airline. **American continues to run a**

- 42 -

*strong operation in an evolving environment in which we are very well positioned because of the hard work our team has done in recent years.*

Our sustained profitability is tied to *our leading network rewards program and operation*. We have a tremendous network and we operate in a reliable and efficient way, and we reward our customers for using it.

### September 13, 2023 Current Report on Form 8-K

114.    On September 13, 2023, American Airlines filed a current report on Form 8-K with the SEC that reported that "As a result of its continued strong operating performance, the Company now expects its third-quarter capacity to be at the high end of its initial guidance, or up approximately 6% to 7% versus the same period in 2022. Total revenue for the third quarter is expected to be approximately flat to prior expectations," and that "[B]ased on these updated assumptions, the Company expects its third-quarter adjusted operating margin to be approximately 4.0% to 5.0% and adjusted earnings per diluted share to be between approximately $0.20 and $0.30."

### September 20, 2023 Current Report on Form 8-K

115.    On September 20, 2023, American Airlines filed a current report on Form 8-K with the SEC that reported that in order "to appropriately incentivize his leadership in overseeing the positive business momentum following the Company's successful post-pandemic transformation," which the Company asserted had "*driven profitability*, strong operational reliability and a strengthened financial position," the Compensation Committee announced it had approved a "total target direct annual compensation" plan for Defendant Isom including "a base salary of $1,300,000, target cash incentive opportunity of 200% of base salary and an annual target long-term incentive grant value of $11,250,000 under the Company's 2023 long-term incentive program."

*October 19, 2023 Press Release*

116.    On October 19, 2023, before the market opened, American Airlines issued a press release announcing its third quarter of the 2023 Fiscal Year financial results for the quarter ended September 30, 2023. The press release reported that American Airlines enjoyed "Record third-quarter revenue of approximately $13.5 billion." The press release contained a quote  from Defendant Isom that stated, in relevant part: "The American Airlines team continues to produce strong results," and that its "team [was] delivering record-setting reliability and operational performance" and "executing on [its] plans and remain well-positioned for the future, supported by the strength of [its] network, [its] young and modern fleet, and [its] outstanding team." Regarding "Guidance and investor update," the press release reported that "Based on demand trends and the current fuel price forecast and excluding the impact of special items, the company expects its fourth-quarter 2023 adjusted operating margin to be 2% to 4%," adding that "American now expects its full-year 2023 adjusted operating margin to be approximately 7%."

*October 19, 2023 Earnings Conference Call*

117.    That same day, on October 19, 2023, American Airlines held an earnings conference call with investors and analysts to discuss the Company's third quarter of the 2023 Fiscal Year financial performance. During the call, Defendant Isom began by stating, in relevant part:

> Today, American reported an adjusted pretax profit of approximately $362 million for the third quarter and earnings result that was above the high end of our latest EPS guidance range. ***The American Airlines team continues to produce strong results***. And as we look ahead to the rest of the year, we continue to prioritize reliability, profitability, accountability and strengthening the balance sheet.

* * *

- 44 -

We produced record third quarter revenues of approximately $13.5 billion, ***driven by a resilient demand environment and record travel rewards program revenue***. Domestic demand remains steady, while international demand continues to drive revenue growth, led by the Atlantic, Caribbean and Central America.

During the third quarter, ***we saw year-over-year growth in corporate and government revenue with a return to more traditional seasonality trends. We remain encouraged by what we're seeing with demand and revenue from unmanaged business travel.*** Importantly, more customers than ever are choosing our travel rewards program by acquiring our co-brand credit cards in record numbers and rolling in the AAdvantage program and shopping for our product through our direct channels.

### January 25, 2024 Press Release

118.    On January 25, 2024, before the market opened, American Airlines issued a press release announcing its fourth quarter of the 2023 Fiscal Year financial results for the quarter ended December 31, 2023. The press release reported that 80% of the Company's bookings stemmed from internet customers, with 65% of the internet bookings via its own in-house channels.

### March 4, 2024 Investor Day

119.    On March 4, 2024, the Company held an investor day conference. During the investor day conference, Defendant Isom stated the following, in relevant part:

So I'm going to take you through a few things. ***First, in terms of demand being back, it's returned***. If there's one thing about the pandemic that we've learned, it's that people want to travel. ***They've come back and we finally are at a point where you can see on the horizon very favorable trend*** and it's a backdrop that's good for American Airlines.

Next, American is a changed airline. We're very different than we were prior to the pandemic. We're delivering on our commitments, and we're focused on our shareholders. And I can't wait to talk to you more about all of that. And then finally, as we take a look at an investment thesis and ***looking forward, we think that we have competitive advantages that will propel American to sustainable margin expansion and ultimately delivering free cash flow. So all of this is in store for today***.

* * *

- 45 -

So we've got a great fleet. We're operating it really well. We've got a network that is enviable. And on top of that, we now are looking at our AAdvantage program and really trying to make sure that we maximize it as a true rewards ecosystem. Now we're able to do that because we're in the process of renegotiating our co-brand credit card deals right now. But in doing this, this will also unleash tremendous value, not just with the co-brand credit cards, but also by underscoring that life as an AAdvantage member as best as you can get it in the airline business. Everything about being an AAdvantage member makes travel easier.

***And in that, I know that we will be able to attract customers, retain them and also offer them value for which they're willing to compensate us.***

120. Also, during the investor day conference, Defendant Raja discussed the sales strategies he designed and how it was positively received by customers, stating in relevant part:

We are making it easier for customers also to shop in a way that's contemporary and tuned to the realities that they're in. And it's worth probably understanding just how far things have changed.

Now historically, travel distribution, especially air travel distribution, has been nothing, if not complicated. Oftentimes for some very good reasons, airlines were doing contracted travel with corporations in a time before the Internet existed. And so in order to solve that problem, airlines created technologies that exist outside of the Internet for a period that is 30, 40, 50 years old. We created chains of intermediaries designed to help facilitate customer transactions. And even despite all of that, even today, we are left with a number of manual processes and workarounds.

And ultimately, the people who bear that expense are the customer and they see it in a few different ways. The air travel shopping experience is by no means contemporary in a world where so many of our customers can buy home or a car or a sandwich from their phone. Further, the servicing experience is oftentimes cumbersome, the thing which people should be able to change on the web or via their app oftentimes involve several calls to several different people.

And ultimately, that turns into expense, both in time and money. It's not too far to think that a small business in a high-growth city like El Paso is spending $25 or $35 per ticket to have all of this, which is very detuned with the other realities in their lives to this problem, and our AAdvantage business and which we are trying to solve the customers' modern contemporary problem. If a company contracts with us through AAdvantage business, what they enable is their travelers will be able to go and earn miles as a multiplier to what I just shared.

So their customers are going to earn even more miles than what I just shared on that prior slide. But very importantly, we can make all of our content available through any Internet-based booking tool there is right now, whether they prefer dot-com or a homegrown tool or another thing altogether, so they can get a contemporary retailing shopping experience, 100% of what we sell through AAdvantage business can be serviced online.

So none of their customers has to call anyone, they can do it from their app from the website. What this means is that the customer instead of spending $25 or $35 per ticket spends 0. It's a material savings for them, and it drives a material savings for us. But as customers and companies come direct to us, it's not just that it reduces expenses, *it's driving satisfaction. After several quarters of doing this now what we see is a statistically significant increase in NPS.*

*Customers who come to us directly or through modern Internet-based retail outlets, report net promoter scores that are 9 to 10 points higher than those who do not. It is our statistically highest Net Promoter Score category. And unsurprisingly, when your customers are happier with you, they're more likely to buy more valuable things.*

*What we also find is that customers who come through our direct channels or modern retailing sites have a 13 points higher propensity to buy a higher value fare when a lower one is available.* That's meaningful. And we're going to make it easier and easier for customers like this to use our product and be our customers.

121.    Defendant May also discussed how the new strategies produced profit for the

Company:

We have developed a track record of delivering on all of our stated objectives, we have become an industry leader in operational performance while meeting the evolving needs of our customers. And we are focused on creating value in the near term and over the long term.

Now you've heard from the team about the value drivers and the value-created initiatives that we are executing on and how we are holding ourselves accountable to achieve them. *We are well positioned to expand margins and consistently produce strong free cash flow*. I'm going to talk about the value of our fleet and today's aircraft order. *I'm also going to provide details on how we are reengineering the business to drive savings and greater productivity along with a better experience for our customers and team members. And lastly, I'll review the financial metrics that we expect to deliver on in the coming years*.

*March 12, 2024 J.P. Morgan Industrials Conference*

122.     On March 12, 2024, Defendants Isom and May attended the J.P. Morgan Industrials Conference in New York City. Defendant Isom began his presentation by stating the following, in relevant part:

Now let me take you through American Airlines story, at least over the last couple of years. So as we came through the pandemic, one of the things that we identified was a real opportunity for American to not just return to where we were in 2019, but actually to accelerate our progress and to really be best in the business on any number of fronts. But we knew that because of the damage caused during the pandemic, and we borrowed a lot of money. We had a lot of issues in terms of rebound. We knew that we had to prove ourselves to the marketplace.

And we started with a very focused plan. A plan back as soon as I took over as CEO 2 years ago, that was based on returning the airline to reliability, reestablishing profitability because we had actually lost a considerable amount of money during the pandemic and then strengthening our balance sheet to address some of the borrowings that we had to take on during the pandemic as well. And that was the singular focus. Of course, we have really long-term goals, but that was a singular focus. And so how did we do on it? Well, American Airlines has never been the best at operating reliability, but we are today.

American Airlines canceled fewer flights on a percentage basis than any other airline, including the industry leader that had been kind of entrenched for more than a decade. I feel really great about where we are. And it's a big deal to American because as we go forward and look at capacity production, this is really efficient way to deliver capacity **and actually hang on to revenue**. And we're seeing right now a 1.5 point improvement in terms of delivering completion factor year-over-year.

And on top of that, we know that the best way to serve our customers, the way to move Net Promoter Scores is by delivering on the most basic, which is reliability, getting people from start to finish with their bags on time every time. So we feel great about this. This is not something we were known for prior to the pandemic. We were going through a massive integration between U.S. Airways and American at that time. As we went through the pandemic, we all suffered with start-up issues as we built back. But for the last 18 months, certainly in the last year, American Airlines has been the best in the business at producing capacity our customers. So great work on that front.

In terms of profitability, same story. As I take a look at 2023, and producing now 7 consecutive quarters of profitability, 2 straight years of profitability. The one thing I would ask you to note, though, that our profitability now is different than it was

- 48 -

prior to the pandemic. And that is different in that we're producing record free cash flow, okay? So it's great news for us, but ***ultimately, that bodes well for the future for American Airlines***.

And as a result of all that, we've been able to really pull down the debt that we had taken on during the pandemic, we set a goal end of 2021 to reduce total debt by $15 billion. We're 75% of the way to that goal. ***By the end of this year, we'll be 85%*** and on top of that, look, we know that we're being noticed. So we've been upgraded by all 3 major credit rating agencies in 2023, a double notch upgrade. That's great news for American. And as we go forward, really something to build on. So reliability, excellent work, profitability plus producing free cash flow and a strengthened balance sheet. So I'm here today telling you that we, American Airlines, is a changed airline in the sense that ***we put goals out there, we hit them***.

123.    The statements in ¶¶ 111-122 above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers—travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

124.    On April 25, 2024, American Airlines filed the 2024 Proxy Statement with the SEC. Defendants Brown, Cahill, Embler, Hart, Isom, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act,

which contained material misstatements and omissions.

125.    The 2024 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Brown, Cahill, Embler, Hart, Isom, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board; (2) the ratification of the selection of KPMP LLP as American Airlines' independent registered public accounting firm for its fiscal year ending December 31, 2024; and (3) the approval, on an advisory basis, of the compensation of American Airlines' executive officers.

126.    With respect to the "Board Role in Risk Oversight," the 2024 Proxy Statement stated the following:

> The Board is responsible for the oversight of the Company's ongoing assessment and management of material risks impacting our business. The Board oversees the Company's enterprise-wide approach to risk management, which is designed to support the achievement of organizational objectives, including strategic objectives, to improve long-term organizational performance and to enhance stockholder value. A fundamental part of risk management is not only understanding the risks we face and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate. Management is responsible for establishing our business strategy, identifying and assessing the related risks and establishing appropriate risk management practices. The Board, either directly or through one or more of its committees, reviews our business strategy and management's assessment of the related risks and discusses with management the appropriate level of risk. The Board relies on each Board committee to oversee management of specific risks related to that committee's function. The CGPR Committee and the Audit Committee, with management's assistance, have developed and coordinated the Board's current risk oversight program. The Board has not established a separate risk committee because the Board believes that the most significant risks we face are most properly directly overseen by the full Board or, in certain cases, the appropriate standing committee.

> The Board oversees and reviews the management of our most significant strategic, financial and operational risks: the day-to-day operation of the airline and the interruption of airline service, revenue production, our information technology systems, and business risks related to labor issues and costs.

The Audit Committee oversees our risk management policies that relate to the financial control environment, financial reporting and disclosure controls, data privacy, cybersecurity risks and other information technology risks, and our procedures for compliance with significant applicable legal, ethical and regulatory requirements that impact our financial statements. The Audit Committee meets regularly with our internal auditors, independent auditors, Chief Executive Officer, Chief Financial Officer, Corporate Controller, Chief Legal Officer and Corporate Secretary, Chief Ethics and Compliance Officer, Chief Digital and Information Officer, Chief Information Security Officer, Chief Privacy Officer and the Company's external advisors. The Audit Committee receives regular risk and internal controls assessment reports from the independent auditors and internal auditors. The Audit Committee also establishes and maintains procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters.

The CGPR Committee oversees our governance-related risks and risk management policies, programs and practices with respect to the Company's sustainability strategy, including environmental and climate change risks and other public and corporate social responsibility issues that reflect the Company's values and character and impact the Company's reputation among its stakeholders.

The Compensation Committee oversees compensation risk management by participating in the creation of, and approving, compensation structures that create incentives that encourage an appropriate level of risk-taking behavior consistent with our business strategy, as is further described in the section entitled "Risk Assessment with Respect to Compensation Practices" below. The Compensation Committee also works with the Chief Executive Officer and the Chief People Officer to oversee risks associated with the retention of our most senior executives.

The Finance Committee oversees financial risk by working with senior management to evaluate elements of credit risk, advising on financial strategy, capital structure and liquidity needs and reviewing our financial risk management policies and practices. Our Chief Executive Officer, Chief Financial Officer and other senior financial executives meet periodically with the Finance Committee to discuss and advise on elements of these risks.

The Safety Committee oversees our risk management policies, programs and practices with respect to operational safety and compliance, matters affecting the safety of our customers and employees, including security and public health and the Company's safety culture. The Safety Committee meets regularly with the Chief Operating Officer, the Vice President of Safety Systems, Efficiency and

Compliance, and other responsible officers to discuss and advise on developing safety risks and standards.

127.    Regarding the Code of Ethics, the 2024 Proxy Statement stated the following:

Our employees, including our principal executive officer, principal financial officer, principal accounting officer, and our directors are governed by one of two codes of ethics of the Company (collectively, the "Codes of Ethics"). The Codes of Ethics have been approved by our Board and require our employees and directors to conduct Company business in the highest legal and ethical manner. The Codes of Ethics meet the requirements of a "code of ethics" as defined by Item 406 of Regulation S-K and the requirements of a code of business conduct and ethics under applicable Nasdaq listing standards. The full texts of the Codes of Ethics and further details regarding the scope of each of the Codes of Ethics are available on our website at www.aa.com under the links "Investor Relations"—"Corporate Governance." We will also provide a copy of the Codes of Ethics to stockholders, free of charge, upon request to our Corporate Secretary. Any amendments to or waivers from the Codes of Ethics will be posted at this location on our website as required by applicable SEC and Nasdaq rules.

128.    Under the direction and watch of Defendants Brown, Cahill, Embler, Hart, Isom, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland, the 2024 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers—travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

129.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

130.    As a result of Defendants Brown, Cahill, Embler, Hart, Isom, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Brown, Cahill, Embler, Hart, Isom, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines.

**The Truth Emerges**

131.    The truth began to emerge on May 28, 2024, when the Company revealed that Defendant Raja, who was, by that time, American Airlines' Chief Commercial Officer, would leave the Company the following month. Defendant Isom revealed the following, in relevant part:

> I've known Vasu for a long time. [His] admirers, creative thinking, his passion. He's been an innovator, a disrupter. He is a good friend, but ***sometimes we need to reset. And in this case, we do.***
>
> * * *
>
> ***We have to be better*** at executing those long-range plans. ***We have to be more attentive*** to the marketplace. ***We have to be more detail-oriented*** and we have to go forward as a team and really ***make it easy*** for American to do business with.

132.    That same day, American Airlines also revealed poor financial results for the first quarter of 2024, causing the Company to cut guidance for the second quarter 2024 as well. American Airlines revealed it only anticipated adjusted earnings of $1.00 to $1.15 per share, down

from its previous range of $1.15 to $1.45 per share, and that its second quarter of 2024 operating margin would be about one percentage point lower than it had previously stated because revenue per available seat mile was significantly less than American Airline's prior guidance.

133.    The very next day, on May 29, 2024, the truth fully emerged when Defendant Isom admitted during a Bernstein Strategic Decisions Conference call that "***we believe [this] is in part due to the changes that we have made to our sales and distribution strategy.***" He further stated that "We all know that NDC, modern retailing, internet-based channels for selling our product is the future of airline distribution. ***But we move faster than we should and we didn't execute well***," and that "***We regret that and the difficulties that it created for our agency and corporate communities***." The NDC strategy had significantly hurt the Company, as Defendant Isom finally conceded that: "One of the things that is very clear is that ***we've driven some customers away. We restricted some customers from actually [finding] our product***. Those are [the] kind of things that we have to be attentive to."

134.    Revealing that the Individual Defendants had known for awhile that the NDC strategy had failed, Defendant Isom revealed that the Company was already making changes to its strategy:

> We're evaluating our strategy holistically and piece by piece. We spent a lot of time listening to our agencies and our corporate customers, and we're hearing [] their feedback.

> * * *

> We're taking some immediate actions to respond and adapt, and over the coming weeks, we'll be working to ensure that we're optimizing for our customers and American as we move forward.

> * * *

- 54 -

We are going to modify our distribution strategy. Specifically, we need to work closely with our agencies and partners to ensure that the transition that we're making is not disruptive to our end customers.

135.    Defendant Isom also conceded that American Airlines had "***used a lot of [sticks***]. We've got to put more [carrots] in place and make sure that our product is available wherever customers want to buy it." He also stated that in the future, American Airlines would review how it solves problems and pays its agencies. Regarding customers, Defendant Isom stated, "We want to make sure that no customer that's out there traveling is made worse off from the changes that we make."

136.    On this news, the price per share of American Airlines' stock fell $1.82, or 13%, from a closing price of $13.44 per share on May 28, 2024, to close at a price of $11.62 per share on May 29, 2024.

137.    On July 25, 2024, when announcing poor financial results for the second quarter of 2024, the Company again cut its profit forecast to between $0.70 and $1.30 a share, marking a sizeable drop from the $2.25 to $3.25 it had forecasted in April 2024 and significantly under the $1.10 to $2.60 per share it had led the investment community to then be expecting. American Airlines also anticipated a revenue drop of up to 4.5% in the third quarter 2024. The $717 million in net income reported in the second quarter of 2024 constituted a 46% drop from the previous year report. In discussing the results during the accompanying earnings conference call that same morning, Defendant Isom reiterated the dismal situation was due to "prior sales and distribution strategy."

138.    On July 25, 2024, *Fortune* published a report titled "American Airlines' attempt to strong-arm its customers into buying tickets directly backfired, sending its profits down nearly

50%":

> American Airlines is sorry, okay? After instituting a booking policy that rubbed many passengers the wrong way, the carrier has seen a dive in profits—and is now walking back the controversial strategy for fear of further hemorrhaging dollars.
>
> The world's second-largest airline is basically standing outside annoyed travel agents' windows with a boom box asking for another chance after bungling it up. It can't afford not to, as its net income in the just-ended second quarter has slipped by 46% to $717 million from a year ago. While the airline has seen record revenue this past quarter, the CEO acknowledges that they're off target for a couple of reasons.
>
> "I want to first acknowledge that our current revenue performance is not where we want it to be," Robert D. Isom, American Airlines CEO, president, and director, said on a less-than-cheery earnings call on Thursday. Attributing some of its issues to an industrywide "imbalance in domestic supply and demand" and American's former sales strategy, the CEO said, "we know we can do better, and we will rise to meet this challenge."

* * *

> The strategy Isom referred to is one where the airline made customers buy tickets directly, as opposed to having the freedom to book from other agencies. The choice alienated corporate customers and led to the ousting of Vasu Raja, American's chief commercial officer, this past spring. Stopping customers from using booking agencies in favor of American's own website proved to be too hasty a move, as Bloomberg noted complaints that the internal technology wasn't developed enough to handle this new policy.
>
> Naturally, travel agents were incensed by the former rule. "To assume that all customers prefer to buy direct through AA.com is arrogant at best," wrote the American Society of Travel Advisors in a fiery statement. "And claiming that consumers asked for NDC is like Apple claiming consumers asked that no wall charger be included with new iPhones. We may have to live with it, but we certainly didn't ask for it," they said, referencing the new policy known as new distribution capability bookings.
>
> Isom soon acknowledged that the plan had backfired. "We know we dug ourselves a hole in the second quarter," he said in late May at the Bernstein Strategic Decisions Conference. Indicating his change of course, the CEO called for a "reset," adding that American "moved faster than we should have, and we didn't execute well."

But such choices end up leaving long-lasting dents in relationships. "They're not going to be able to turn it around in three months—that's for sure," Helane Becker, a TD Cowen analyst, told Bloomberg Television this past spring. "It will take at least 18 months to two years to turn things around, and even then it might take longer."

And now American is seeing the fruits of said misstep. In its latest earnings report, Isom said a "reset will take some time," likely impacting earnings throughout the rest of the year. There's some mending of bridges to be done, too. Isom said he's so far spoken to more than 30 of his counterparts at corporate customers: "We recognize we have a lot of relationships to repair."

## <u>DAMAGES TO AMERICAN AIRLINES</u>

139.    As a direct and proximate result of the Individual Defendants' conduct, American Airlines has lost and expended, and will continue to lose and expend, many millions of dollars.

140.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

142.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

143.    As a direct and proximate result of the Individual Defendants' conduct, American Airlines has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their

misrepresentations.

## DERIVATIVE ALLEGATIONS

144.    Plaintiff brings this action derivatively and for the benefit of American Airlines to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of American Airlines, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

145.    American Airlines is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiff is, and has been at all relevant times, a shareholder of American Airlines. Plaintiff will adequately and fairly represent the interests of American Airlines in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

147.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

148.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following twelve individuals: Defendants Isom, Brown, Cahill, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland (the "Director-Defendants") as well as non-party Howard Ungerleider (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of these twelve Directors.

149.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

150. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

151. Additional reasons that demand on Defendant Isom is futile follow. Defendant Isom has served as American Airlines' President, CEO, and as a Company director since March 2022. As such, the Company provides Defendant Isom with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Isom is a non-independent director. As American Airlines' CEO and as one of its trusted directors, Defendant Isom was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally made. As a trusted Company director, Defendant Isom conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes,

and consciously disregarded his duties to protect corporate assets. In addition, Defendant Isom solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself as well as Director-Defendants Brown, Cahill, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. Moreover, Defendant Isom is named as a defendant in the Securities Class Actions. For these reasons, Defendant Isom breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Adriane Brown is futile follow. Defendant Adriane Brown has served as a Company director since February 2011. She also serves as Chair of the Safety Committee and as a member of the Audit Committee. Defendant Adriane Brown has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Adriane Brown solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Isom, Brown, Cahill, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Adriane Brown breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Cahill is futile follow. Defendant Cahill has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Finance Committee. Defendant Cahill has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Cahill solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Cahill breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Embler is futile follow. Defendant Embler has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Safety Committee. Defendant Embler has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Embler solicited the 2024 Proxy Statement, which

contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Embler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Hart is futile follow. Defendant Hart has served as a Company director since 2013. He also serves as the Chair of the Audit Committee and as a member of the Safety Committee. Defendant Hart has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Hart solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Embler, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Hart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Kronick is futile follow. Defendant Kronick has served as a Company director since November 2015. She also serves as a member of

the Safety Committee and as a member of the CGPR Committee. Defendant Kronick has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Kronick solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Isom, Adriane Brown, Cahill, Embler, Hart, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Kronick breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Nesbitt is futile follow. Defendant Nesbitt has served as a Company director since November 2015. He also serves as the Chair of the CGPR Committee and as a member of the Audit Committee. Defendant Nesbitt has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Nesbitt solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Embler, Kronick, Hart, O'Leary, Reynal, Smith, and

Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Nesbitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant O'Leary is futile follow. Defendant O'Leary has served as a Company director since 2013. She also serves as a member of the Finance Committee and as the Chair of the Compensation Committee. Defendant O'Leary has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant O'Leary solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Isom, Adriane Brown, Cahill, Embler, Hart, Nesbitt, Kronick, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant O'Leary breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Reynal is futile follow. Defendant Reynal has served as a Company director since September 2022. He also serves as a member of the CGRP Committee and as a member of the Compensation Committee. Defendant Reynal has received and continues to receive lucrative compensation for his role as a director as described

above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Reynal solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Embler, Kronick, Hart, O'Leary, Nesbitt, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Reynal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since January 2022. He also has served as the Company's Independent Chairman since April 30, 2023. Defendant Smith has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Smith solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Embler, Kronick, Hart, O'Leary, Nesbitt, Reynal, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Smith breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Steenland is futile follow. Defendant Steenland has served as a Company director since October 2020. He also serves as Chair of the Finance Committee and as a member of the Compensation Committee. Defendant Steenland has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Steenland solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Isom, Adriane Brown, Cahill, Embler, Kronick, Hart, O'Leary, Nesbitt, Reynal, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines. For these reasons, Defendant Steenland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on the Board is futile follow.

163.    Defendants Adriane Brown, Cahill, Embler, Hart, and Nesbitt (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee

Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

164. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Ethics by failing to act with integrity, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

165. American Airlines has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for American Airlines any part of the damages American Airlines suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants

would be futile.

166.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

167.    The acts complained of herein constitute violations of fiduciary duties owed by American Airlines' officers and directors, and these acts are incapable of ratification.

168.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of American Airlines. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of American Airlines, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a

basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

169.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause American Airlines to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

170.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of**
**Section 14(a) of the Exchange Act**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174.    Under the direction and watch of Defendants Isom, Brown, Cahill, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers—travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

175.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

176.    In the exercise of reasonable care, the Individual Defendants should have known

that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the election of the Company's directors.

177.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Isom, Brown, Cahill, Embler, Hart, Kronick, Nesbitt, O'Leary, Reynal, Smith, and Steenland to the Board, thereby allowing them to continue breaching their fiduciary duties to American Airlines; and (2) approve the selection of KPMG LLP as American Airlines' independent registered public accounting firm for its fiscal year ending December 31, 2024.

178.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

179.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of American Airlines' business and affairs.

182.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.    The Individual Defendants' conduct set forth herein was due to their intentional or

- 71 -

reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of American Airlines.

184.     Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about American Airlines' business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the NDC sales and distribution strategy pushed out American Airlines' most lucrative customers—travel agencies and corporate travelers; (2) the NDC sales and distribution strategy was not executed effectively, making it more difficult for certain customers to book flights; (3) there was not "strong demand" for the Company's services and the loss of business from travel agencies and corporate travelers triggered drops in revenue and earnings; (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects; (5) such activities made  American Airlines vulnerable to substantial reputational harm; and (6) the Company lacked adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

185.     In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

186.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

187.    In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $235,000.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, including failing to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of American Airlines' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, American Airlines has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, American Airlines.

194.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from American Airlines that was tied to the performance or artificially inflated valuation of American Airlines or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

195.    Plaintiff, as a shareholder and representative of American Airlines, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

196.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 74 -

198.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence American Airlines, for which they are legally responsible.

199.    As a direct and proximate result of the Individual Defendants' abuse of control, American Airlines has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, American Airlines has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of American Airlines in a manner consistent with the operations of a publicly held corporation.

203.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, American Airlines has sustained and will continue to sustain significant damages.

204.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused American Airlines to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

208.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

209.    Plaintiff, on behalf of American Airlines, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Isom, May, Seymour, Jayaram, Cole Brown, and Raja for Contribution Under Sections 10(b) and 21D of the Exchange Act

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    American Airlines and Defendants Isom, May, Seymour, Jayaram, Cole Brown, and Raja are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Isom's, May's, Seymour's, Jayaram's, Cole Brown's, and Raja's willful and/or reckless violations of their obligations as officers of American Airlines.

212.    Defendants Isom, May, Seymour, Jayaram, Cole Brown, and Raja, because of their positions of control and authority as officers of American Airlines, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of American Airlines, including the wrongful acts complained of herein and in the Securities Class Actions.

213.    Accordingly, Defendants Isom, May, Seymour, Jayaram, Cole Brown, and Raja are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

214.    As such, American Airlines is entitled to receive all appropriate contribution or indemnification from Defendants Isom, May, Seymour, Jayaram, Cole Brown, and Raja.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of American Airlines, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to American Airlines;

(c)    Determining and awarding to American Airlines the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing American Airlines and the Individual Defendants to take all necessary actions to reform and improve American Airlines' corporate governance and internal

procedures to comply with applicable laws and to protect American Airlines and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of American Airlines to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding American Airlines restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 26, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, George Leon, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26__ day of September, 2024.

George Leon